## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jacqueline C.,<br><br>Plaintiff,<br><br>v.<br><br>Kilolo Kijakazi, *Acting Commissioner of Social Security*,<br><br>Defendant. | Case No. 21-cv-1612 (JRT/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jacqueline C. seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her Title II application for a period of disability and application for disability insurance benefits ("DIB"). This matter is before the Court on the parties' cross-motions for summary judgment [ECF Nos. 20, 30], which were referred to the undersigned for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the Commissioner's motion be granted and the Plaintiff's motion be denied.

## I.    Background

### A.    Procedural History

Plaintiff filed an application for Title II DIB on September 14, 2018, for the period between an alleged onset date of September 15, 2015, and the date she was last insured,

June 30, 2018.  (R. 16, 39, 300).[1]  The application was denied initially (R. 65-72) and

upon reconsideration (R. 75-83).  Plaintiff timely requested a hearing before an ALJ.  (R.

95.)  The ALJ convened a telephonic hearing on December 10, 2020, at which Plaintiff

and vocational expert Cyndee Burnett testified. (R 35-65.)

On December 18, 2020, the ALJ issued an adverse written decision finding

Plaintiff was not disabled between September 15, 2015, and June 30, 2018. (R. 16-28.)

The Appeals Council denied Plaintiff's request for review, which made the ALJ's

decision the final decision of the Commissioner.  (R. 1-5.)  Plaintiff then filed this action

for judicial review.

### B.      Relevant Medical Records and Other Evidence

Plaintiff's arguments focus on the severity of her mental impairments resulting

from trauma experienced throughout her life; accordingly, the Court will focus on that

evidence.  The trauma includes the sexual violence and the death of loved ones, including

one by violent suicide.

Plaintiff suffered traumatic events during her early life, including the death of her

two-year-old niece when Plaintiff was 8 years old, and the death of her brother-in-law in

a swimming pool accident when she was 16.  (R. 923.)  She ran away from home at the

age of 16 and married her first husband.  (R. 1089.)  She was gang-raped at age 19 by

men who were in her band.  (R. 923.)  She has been married four times in total.[2]  (R.

---

[1] The administrative record (R.) is located on the docket at ECF No. 17.

[2] Jaeger stated in her reports that Plaintiff had been married five times.  (*See, e.g.*, R. 923, 1089, 1092; *but see* R. 828 (noting four marriages).)  This is contrary to the notes of Riester and Kahler.  (R. 1112, 1135.)  In any case, the deceased son was the product of

1112, 1135.)

She had two sons from her second marriage[3] and one child from her third marriage. (R. 1135.) She left her third husband when her son from that union was five years old. (R. 1089.) She planned on having her son move in with her and her new husband, but her fourth husband initially refused. (R. 1089.) In 2014, her son, then 16, was set to move in with her in the fall. (R. 1089.) But on August 26, 2014, Plaintiff learned over the telephone that her 16-year-old-son had committed suicide using a shotgun. (R. 316.) At some point, Plaintiff saw photos of her dead son. (*See* R. 1096 (describing intrusive thoughts of pictures of blood).)

In June 2015, Plaintiff sought medical care for increasing difficulty working as it neared the anniversary of her son's death. Plaintiff reported trouble concentrating, poor sleep, and shortness of breath. (R. 536-38.) Doctor Brian Proctor, M.D., and Nurse Sharon Riester of the Mayo Clinic, her primary care provider, started Plaintiff on an anti-depressant[4] for situational depression with anxiety, although Plaintiff indicated a preference for assistance through her faith and her church. (R. 538.)

Plaintiff continued to work at her job as a bank teller until September 15, 2015. (R. 292.) At that point, she left her job because invasive and recurring thoughts of her son's

---

her marriage to her most recent ex-husband, whom the Court will refer to as Plaintiff's third husband in accord with the most detailed record. (R. 1135.)

[3] Again, Jaeger's notes differ and indicate that Plaintiff had two sons from her first marriage. (R. 910.)

[4] Plaintiff's medications and dosages shifted over time. She has generally taken Xanax (Alprazolam), Lexapro (Escitalopram), Zoloft (Sertraline), Lorazepam, BuSpar, and other anti-anxiety medications throughout the time in question.

3

death made it too difficult to be upbeat and happy and concentrate. (R. 458-460.) Her primary care physician increased Plaintiff's medication and recommended counseling. (R. 524-25.)

In October 2015, Plaintiff started counseling with Dr. Kathryn Amundson. Plaintiff was observed to have a sad, anxious mood, constricted affect, and retarded psychomotor activity. (R. 459.) She also had fleeting thoughts of wanting to die. (R. 459.) At that time, "it [was] very obvious [Plaintiff] was still grieving the loss of her son and the recent anniversary [had] opened these wounds even further." (R. 458.) However, Plaintiff did not continue with Dr. Amundson because she wanted to find a Christian counselor. (R. 459.) In the meantime, she participated in a weekly grief support group. (R. 516.)

Plaintiff saw Riester on January 14, 2016, and asked her to certify that she was still unable to work. (R. 516.) Riester agreed to certify that Plaintiff was unable to work for another week, but declined to certify further until Plaintiff participated in counseling. (R. 516.) Plaintiff had just found a new therapist, LeeAnn Gumulauskas, M.S., a licensed counselor. (R. 853-856.) Plaintiff visited Gumulauskas through October 2016. (R. 853.) In the early months, Plaintiff reported feeling sad, hopeless, and worthless. (R. 853.) She indicated decreased concentration and memory, mood swings, anger, and crying spells. (R. 853.) Her anxiety led her to panic when leaving the house. (R. 853.) During her therapy sessions, Plaintiff said she felt guilty for leaving her son with her father at the time of his death and told the therapist that she tried praying to raise her son from the dead. (R. 857-60.) Gumulauskas diagnosed Plaintiff with major depressive disorder,

recurrent, severe, and moderate to severe anxiety.  (R. 855-56.)

She reported some progress from February 2016 through June 2016.  In February she started playing guitar and singing again, even attending performances which were a "source of fun and great joy."  (R. 861.)  At the same time, she was taking Xanax daily. (R. 861.)  In March, Plaintiff was questioning everything and felt as if she was not making progress in any area of her life.  (R. 867.)  But towards the end of the month, she was having more positive days and even sang at the funeral of a friend's son.  (R. 869, 871.)  In April, she reported the lows were not as low and she could manage issues as they came up.  (R. 871.)  In May, she reported doing overall better.  (R. 873.)  Despite the progress, Plaintiff felt guilty about her son's death. (R. 864, 867, 873.)  She was also using alcohol to cope. (R. 869, 876.)

As the second anniversary of her son's death approached, her symptoms worsened.  In July 2016, Plaintiff reported feelings of anger and bitterness after arriving at the conclusion that she has to accept that her son is gone. (R. 876.)  She started taking Gabapentin and Cymbalta, and she was worried about the interaction between her medications and alcohol.  (R. 876.)  Dr. Proctor, in consultation with Riester, stopped the Gabapentin because of its interactions with alcohol.  (R. 478.)  In August 2016, Plaintiff wanted to enter a ten-month inpatient facility for alcohol use treatment, Midwest Mission, but it required her to wean herself off medications.  (R. 485-88.)  In November, she completely weaned herself off medication, but decided not to enter the treatment center. (R. 477-78.)   By December, she decreased her drinking to 1 to 2 drinks a night and received significant support from her church.  (R. 470-72.)

Plaintiff did not receive any mental health treatment from January 2017 through November 2017. (R. 469, 578-84, 1206-27 (other records).)  During her annual exam in December, Riester noted that "last year has been much more healthy as [Plaintiff] has stopped drinking, has attended [Alcoholics Anonymous (AA)], has stopped smoking, and has gotten more physically active." (R. 605.)  At that time Plaintiff expressed interest in a low-dose antidepressant, and Riester recommended low-cost counseling.  (R. 604-07.)

In April 2018, Riester prescribed an antidepressant, Lexapro, upon Plaintiff's request and again encouraged counseling.  (R. 601.)  In follow-up visits, Riester noted some symptoms of depression and recommended counseling, the use of a journal, and exercise.  (R. 597-99.)  Plaintiff indicated significant financial problems.  (R. 598.)  To avoid costs, Plaintiff called in for medication adjustments over the next few months.  (R. 594-96, 600, 645-46.)

Per the advice of her primary care provider, Plaintiff found a new therapist, Lisa Jaeger, M.S., a certified counselor who treated her from April 2018 through December 2020.  During the initial months, Plaintiff attended counseling once or twice a week.  (R. 896-902, 905-28.)  In the intake assessment, she reported lifelong depression from troubling life events, which increased with her son's suicide.  (R. 639-644, 923-928.)  She was able to play guitar and sing in her band, but her anxiety interfered with solo performances.  (R. 639-44, 923-28.)  She had been sober for nine months, had a sponsor, and regularly attended AA meetings. (R. 639-44, 923-28.)  She felt overwhelmed and suffered flashbacks and panic attacks.  (R. 639-44, 923-28.)  She struggled to concentrate due to intrusive thoughts of her son's suicide.  (R. 639-44, 923-28.)  She angered easily.

6

(R. 639-44, 923-28.)

In May 2018, Plaintiff initially reported feeling well for several days, believing her medication was helping. (R. 922.) But days later, she felt like the medication was not enough. (R. 920.) Plaintiff took steps to start living her life again, including buying golf clubs. (R. 922.) By mid-month, she reported four anxiety attacks in one day. (R. 920.) Her anxiety affected her relationship with her current husband. (R. 918.) She spoke of her triggers, including those related to her sexual assault and her son's suicide. (R. 915-22.) She felt angry at her decision-making and her ex-husband's conduct around the time of her son's death and shameful about the sexual assault. (R. 915-22.) At the end of the month, she asked to increase her therapy to twice a week. (R. 917.)

As the fourth anniversary of her son's death and their final summer vacation drew closer, she felt more stressed out and hoped to wean off her medications after the anniversary dates passed. (R. 593.) She tried to focus on her music. (R. 908.) She attended AA meetings five times a week. (R. 905, 908.)

In a June 13, 2018 letter to Riester to advocate for a "fast acting short-term anti-anxiety" prescription, Jaeger wrote that Plaintiff reported decreased symptoms as a result of the medication. (R. 905.) Jaeger described Plaintiff's mental health symptoms as "moderate." (R. 905.) At the same time, Plaintiff reported regular panic attacks every other day. (R. 905.) Jaeger attached a summary of Plaintiff's assessments through the Beck Anxiety Inventory (BAI), Beck Depression Inventory (BDI), and the Post Traumatic Stress Disorder (PTSD) Checklist (Civilian Version) (PTSD-C). (R. 906.) A higher score in these assessments suggests more severe symptoms. Compared to her

initial tests in April, Plaintiff tested lower on every assessment. (R. 906.) Her anxiety went from moderate to low. (R. 906.) Her depression went from severe to moderate. (R. 906.) And her PTSD symptoms went from being mostly moderate with several symptoms in the extreme range to mostly moderate with some indications in the more severe categories. (R. 906.) Simply put, her team of providers "seem[ed] to be working." (R. 907.)

Less than a week after Jaeger wrote the letter, Plaintiff attended a therapy session depressed, indicating that the night prior she felt like shooting herself. (R. 900.) She thought about going to the emergency room, but she called people instead. (R. 900.) Her relationship with her husband was very strained. (R. 900.) Four days later, Plaintiff reported she felt reluctant to take Xanax because it felt like a failure, but when she did take it, she was able to make it through her music jobs. (R. 899.) Jaeger noted that "[Plaintiff] has been experiencing decreased anxiety, however has exacerbations, and tends to get stuck on worries and becomes afraid." (R. 899.) Plaintiff played another gig late in the month, even though she felt irritated toward a band member. (R. 898.) Overall, Plaintiff felt she was not experiencing the same "extreme up and down emotions lately." (R. 896.) Instead, she felt flat and lacked motivation, which interfered with getting music gigs. (R. 897.)

In July,[5] she experienced joy and fun for the first time since her son's death. (R. 895.) But her son's death and their last vacation together began to occupy Plaintiff's

_____

[5] The Court notes here that from this point on, the medical records postdate June 30, 2018, the date last insured.

mind. (R. 888.) She felt guilty and shameful about her last encounters with her son and about his son's suicide and sobbed throughout her therapy sessions. She had difficulty trusting her judgment, developed obsessive ritualistic thoughts, and struggled to go out in public. Her anxiety increased significantly, and she began smoking again to cope. (R. 775-80, 888–89.) Nevertheless, she was able to participate in three gigs in one weekend. (R. 889, 891.)

In August 2018, Plaintiff reported feeling a lot better. (R. 771.) She set up several gigs in August and September and began planning for a music video. (R. 771.) She felt "her son's death is getting easier to deal with." (R. 771.) Jaeger observed that Plaintiff was "less anxious and depressed evidenced by her ability to participate in activities, and her desire to get up early in the morning, and pursuing life." (R. 771.) She felt excited about moving forward, applied for a job, decided to buy a cat, and scheduled a pedicure. (R. 767.) At the end of August Plaintiff described feeling like she was on a roller coaster of emotions, referring to her arguments with her husband. (R. 765.) She focused on her music and was able to do three gigs in three days. (R. 763.) Plaintiff reported her anxiety level as an eight out of ten and cried during her August 31 therapy session. (R. 763.) She reported feeling painful all the time, which Jaeger attributed to the recent anniversary of her son's death. (R. 763.) Plaintiff began worrying about her other sons. (R. 763.)

In September, Plaintiff was fatigued, irritable, and anxious. (R. 751-64.) Plaintiff reported having panic attacks five times a week. (R. 760.) She also reported intrusive thoughts that impacted her sleep. (R. 760.) Jaeger suggested Plaintiff pursue eye

movement desensitization and reprocessing (EMDR) therapy, but Plaintiff declined due to cost. (R. 758.) Around this time, Jaeger observed that Plaintiff was wearing the same clothes in multiple therapy sessions and looked more disheveled. (R. 758.)

But her several-week downturn leveled out by September 10. (R. 756.) She still had a "cloud of depression" hanging over her, but she was able to play a gig in Lake City, although she had difficulty since this where she was when she learned of her son's death. (R. 756.) In late September, she reported feeling like she had no purpose, but she indicated an intent to play a gig with one of her sons. (R. 751, 761.)

In October 2018, Plaintiff's anxiety increased as she navigated various triggers such as guns, the place of her son's death, her son's name. (R. 747, 749.) Applying for social security disability benefits, finding old emails about her son's funeral and photos of him on her computer, and her mother's illness exacerbated Plaintiff's symptoms. (R. 744, 745.) She had increased suicidal ideation. (R. 745.) She did find some bearable days versus the "years of every moment of every day being excruciating." (R. 742.) She was starting to build emotional stamina. (R. 742.) Retesting of the BAI, BDI, and PTSD-C showed an increase in severity, including modern to severe anxiety, extreme depression, and above moderate PTSD symptoms. (R. 650.)

In November 2018, the social security application process, coupled with caring for her ailing mother, brought forth a swell of emotions. (R. 738-39.) Plaintiff indicated that she often could not leave the house, but it was becoming easier. (R. 735.) She felt true moments of joy when with friends. (R. 735.) Overall, she felt 30-40% better. (R. 735.) However, Plaintiff's brother was suicidal and talking about shooting himself towards the

10

end of the month, which made her emotionally exhausted.  (R. 733.)

In December 2018, Plaintiff focused on her Al-Anon teachings.  (R. 732.)  She did not feel emotionally strong enough to move on from her son's death.  (R. 732.)  The holidays were extremely tough for her, and she considered leaving her husband.  (R. 686.)  She was suicidal with an intent and a plan.  (R. 686.)  Plaintiff was using Xanax less, but she took it before bed to avoid dreams and nightmares.  (R. 729.)

At the end of December, state agency physicians opined that Plaintiff's mental and physical health conditions were not severe, resulting in no limitations and a denial of benefits. (R. 65-72.)  Jaeger wrote a letter in favor of reconsideration, opining that it was unlikely Plaintiff would ever be able to return to work because Plaintiff was rarely able to leave her home due to ruminations over her son's death, her struggles with hygiene, and the inability to perform even the basic activities of daily living.  (R. 637-38.)  She also indicated that social security income "may assist [Plaintiff] in feeling like she can contribute to her family."  (R. 638.)  She attached the initial intake assessment and several "diagnostic assessments" reflecting Plaintiff's care, medication, and progress since April 2018.  (R. 639-51.)  Upon reconsideration in January 2019, the state agency physicians arrived at the same conclusion as previously and benefits were again denied. (R. 75-83.)

In January 2019, Jaeger reported Plaintiff was making progress, although she would often decompensate with increased sadness, depression, and anger.  (R. 782-83.)  She adamantly denied all thought of suicide to Riester.  (R. 688.)  Although she started BuSpar, side effects caused her to stop by the end of January.  (R. 682.)  Plaintiff

11

reported to Jaeger that she missed her son every day pictured him lying with the shotgun in his mouth.  (R. 789.)  She also said she had passive "wish-I-were-dead" thoughts.  (R. 789.)  She felt she was regressing and secluding herself.  (R. 790.)  But, she reported that she "is not lingering in her thoughts about her son, and is finding something else to do quickly."  (R. 791.)  She felt more depressed in the morning, so she would take a Xanax. She felt there was an unbearable dark cloud constantly looming over her.  (R. 792.)

At the end of the month, Plaintiff shared her Pentecostal beliefs, and that she prays in tongues.  (R. 792.)  As a former minister, she believed originally in the ability to raise the dead through prayer, exorcism, laying hands on the sick, and making power, energy, and faith happen.  (R. 792.)  She considered herself modern Pentecostal.  (R. 792.)

In February 2019, Plaintiff felt constantly torn between her religious beliefs that she developed after her son's death and the religious beliefs she learned growing up.  (R. 784.)  She suffered daily panic attacks and had difficulty falling and staying asleep.  (R. 787.)  In a letter to Riester about Plaintiff's request for an increase in medication, Jaeger noted that Plaintiff's symptoms should have been manageable with her medications (currently Zoloft) and approximately weekly therapy.  (R. 787.)  Jaeger's notes from the session immediately prior to the letter suggest she felt Plaintiff's desire to increase her medications was abrupt and a way to distance herself from therapy.  (R. 787-88.)

In April 2019, Plaintiff's mental condition deteriorated due to the anniversary of her son's birthday and a funeral that month.  (R. 781.)  She felt like she was in limbo and lacked the motivation to find gigs.  (R. 781.)  Her two living sons helped her through her deceased son's birthday.  (R. 781.)

On June 20, 2019, Jaeger indicated that Plaintiff "has begun to find relief of overall anxiety symptoms." (R. 1129.) "[She] has some 'decent' days and had 1 mo[nth] that was pretty good. She gets out of the house sometimes. . . . Her mental health is more stable." (R. 1129.)

Jaeger provided an updated diagnostic assessment of Plaintiff in July 2019 after a total of 95 ninety-minute sessions since April 2018. (R. 662-67.) Plaintiff attended therapy intermittently as needed. (R. 662.) Plaintiff had difficulty following through with commitments such as performances with her band. (R. 663.) She experienced several triggers including the anniversary dates of her son's birthdate, their last summer together, her son's suicide, and her son's funeral. (R. 663.) She continued to experience depression and PTSD symptoms. Retesting through the BAI, BDI, and PTSD-C showed extreme depression, low anxiety, and extreme PTSD symptoms. (R. 664.) Jaeger noted that Plaintiff struggled to pay attention and remember information and her processing speed lagged, although her cognition had improved by at least 50 percent. (R. 664.). Plaintiff's judgment was deemed "slightly impaired." (R. 664.) Her thought content was appropriate, although she suffered from obsessive, ritualistic thoughts, which seemed to be a symptom of her PTSD. (R. 664-65.) Based on Plaintiff's self-reports, Jaeger, although she could not make the diagnosis, believed Plaintiff may suffer from attention deficit hyperactivity disorder. (R. 664-65.) Jaeger continued to have the opinion that Plaintiff met the criteria for a diagnosis of PTSD and major depressive disorder without psychotic features. (R. 665-66.)

Jaeger opined that Plaintiff's son's death was the traumatic triggering event for

13

Plaintiff's PTSD.  (R. 665.)  As a result, she reported, Plaintiff suffered from nightmares, flashbacks, and intrusive thoughts.  (R. 665.)  She had also begun to avoid psychotherapy and triggers.  (R. 665.)  She was often irritable and angry, and had outbursts of yelling and throwing things.  (R. 665.)  "She has extreme difficulty participating in any daily activities and tends to isolate herself and feels detached from others."  (R. 665.)  Jaeger concluded that Plaintiff lacked a support system.  She had a depressed mood every day, experiencing slowed thoughts and reduced physical movement daily.  Jaeger referred Plaintiff for a psychiatric exam to substantiate her social security disability claims and, in the meantime, recommended medication changes, continuing psychotherapy around triggering dates, couple's therapy, the development of a support system, and EMDR.  (R. 666.)

Plaintiff took a break from therapy in August and September.  (R. 823-30.)

In October 2019, Jaeger referred Plaintiff to the ASC Psychological Clinic for evaluation.  Jaeger indicated that Plaintiff could not likely maintain employment due to her stressors and despite support groups (AA and Al-Anon, which she attended three to five times a week), therapy, and medication.  (R. 806.)  She performed a residual functional capacity (RFC) assessment, and determined Plaintiff had a fair[6] ability to follow work rules, use judgment, interact with supervisors, function independently, maintain attention and concentration, follow work rules, maintain personal appearance,

---

[6] Fair was defined as "ability to function in this area is seriously limited, but not precluded.  May require extra assistance, more frequent breaks or may be off task for period of time.  Such limitations may occur up to 25% of the work day."  (R. 801.)

behavior in an emotionally stable manner, and relate predictably in social situations. (R. 833-34.) Plaintiff had poor or no ability to relate to co-workers, deal with the public, deal with work stresses, or demonstrate reliability. (R. 833-34.) Finally, she would likely miss work more than three times per month due to her impairments or treatment. (R. 835.)

Ronald Kahler, a licensed psychologist, evaluated Plaintiff and issued a report on November 19, 2019. At the evaluation, she appeared clean and with good personal hygiene. (R. 794.) She was polite and cooperative. (R. 794.). She provided background information on her education, her marriages, and her hobbies. (R. 794-95.) She also discussed her sexual trauma and her son's suicide, the intrusive thoughts related to both, and the resulting anxiety. (R. 794-804.) Plaintiff experienced fear, panic, anger, guilt, and shame. (R. 796.) She reported feeling irritable, agitated, and angry, that she was unable to effectively communicate with and trust others, and that she ruminated on the past, especially when she retired and tried to sleep. (R. 796.) She also reported experiencing panic attacks after her son's death. (R. 797-98.)

Plaintiff described to Kahler her activities of daily living and current level of daily functioning. (R. 798.) She got up at 8 a.m. and drank a pot of coffee for breakfast. (R. 798.) From 9 a.m. to noon, she drank coffee, smoked cigarettes, and read. (R. 798.) She ate a light lunch such as a yogurt, banana, and coffee. (R. 798.) From 1 p.m. to 4 p.m., she again drank coffee, smoked cigarettes, and read. (R. 798.) When she felt up for it, she practiced singing and playing her guitar. (R. 798.) She prepared supper at 5 p.m., watched television afterward, and fell asleep between 9 and 11 p.m. (R. 798.) She showered or bathed every five to seven days and rarely cleaned the house. (R. 798.)

Upon evaluation, her affect was blunt, and her mood was depressed. (R. 799.) Her thoughts were rational and logical. (R. 799.) Testing showed difficulty focusing, concentrating, staying on task, and utilizing working memory. (R. 799.) She presented herself as of at least average intelligence and a "reasonably reliable informant." (R. 799.)

Kahler diagnosed Plaintiff with general anxiety disorder, PTSD, major depression, severe panic disorder, and sleep disturbance. (R. 800.) He opined that Plaintiff did not have the ability to relate to coworkers and supervisors or tolerate the stress of competitive work. (R. 800.) However, she did have the ability to follow simple instructions through to their completion and manage her own finances. (R. 800.)

Kahler completed a mental residual functional assessment on December 3, 2019. (R. 801-04.) He reported Plaintiff had a fair ability to follow work rules, use judgment, interact with supervisors, function independently, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (R. 802-04.) She had poor or no ability to relate to co-workers, deal with the public, or deal with work stresses. (R. 802.) Finally, Kahler opined Plaintiff would likely miss work more than three times per month due to her impairments or treatment. (R. 804.) These assessments were virtually identical to Jaeger's October 23, 2019 assessment.

In November 2019, Plaintiff reported feeling depressed, fearful, and hyper vigilant, and that joy was unsustainable. (R. 809, 811.)

In December 2019, Plaintiff was sad before the holidays. (R. 813.) She said she spent a "wonderful Christmas with her two sons and husband." (R. 815.) She found joy

16

while everyone was under one roof.  (R. 816.)  However, she experienced an

insurmountable fear afterward when her sons left.  (R. 815.)  She reported feeling

debilitated and triggered by small stressors.  (R. 815.)  She had suicidal ideation and

looked up how to successfully complete a suicide but denied such thoughts at the time of

the therapy appointment.  (R. 815-16.)  She was unable to handle spending Christmas day

with her mother from an emotional perspective.  (R. 816.)  She thought about drinking

and infidelity, but she resisted.  (R. 816.)

In January 2020, a story about a car accident involving the death of children

triggered Plaintiff.  (R. 819.)  She became hypervigilant and preoccupied with the story.

(R. 819.)  She experienced some stress immediately before the social security hearing.

(R. 821.)  She continued to have suicidal ideation in January.  (R. 821.)  She reported

thinking all day long about her trauma.  (R. 821.)  Jaeger emphasized the need for regular

therapy sessions because of Plaintiff's tendencies to regress in the interim.  (R. 822.)

Jaeger performed an updated diagnostic assessment to summarize progress made

in January.  (R. 823-30.)  She did not retest Plaintiff's "consistent diagnosis and severity

of symptoms."  (R. 825.)  Plaintiff remained irritable and depressed, which resulted in

increased difficulties with activities of daily life and hygiene, psychomotor retardation,

fatigue, loss of energy, and perfectionist tendencies.  (R. 826-28.)  Jaeger diagnosed

Plaintiff with obsessive compulsive personality disorder (due to her perfectionist

tendencies) and dependent personality disorder (based on her excessive need to be taken

care of and her dependence on support groups and romantic partners).  (R. 827.)

In February 2020, Plaintiff felt at peace for more than one day and took "a

17

vacation from her mind." (R. 1150.) Jaeger considered this a breakthrough but continued to worry about Plaintiff's previous suicidal ideation. (R. 1150.) Jaeger created retrospective mental RFC assessments encompassing the time periods from April 18, 2018, through December 29, 2018. (R. 845-48), from January 1, 2019, through October 22, 2019 (R. 841-844), and from October 23, 2019, to January 1, 2020 (R. 837-40). Plaintiff's mental faculties ranged from poor or none to fair.

In March 2020, Plaintiff regularly saw Jaeger once a week in anticipation for the trigger of her deceased son's birthday. Plaintiff reported a fear of leaving conversations on a sour note and then something happening to the other person. (R. 1018.). She experienced feelings of abandonment and anxiety. (R. 1018.) But then Plaintiff started Effexor (Venlafaxine). (R. 980-86.) She told Jaeger that her new medication helped and that she was not ruminating as much and did not feel debilitated. (R. 1021.) However, her panic attacks still interfered with performances in Lake City. (R. 1021.) A week later Plaintiff reported using Xanax two to three times a day to "numb the pain." (R. 1025.) Her personal hygiene decreased. (R. 1025.) She started drinking after 2½ years of sobriety. (R. 1028.) She sought a purpose in life and a passion. (R. 1031.)

In April, Plaintiff decreased her use of Xanax to at most once per day. (R. 1034.) She enjoyed staying up late watching television series, and the alcohol helped to make her feel free. (R. 1031, 1034.) Although Jaeger tried to convince Plaintiff to take Xanax rather than alcohol, Plaintiff preferred the alcohol. (R. 1034.) She reported feeling more acceptance about her son's death and able to let her be herself. (R. 1034-35.) On the anniversary of her deceased son's birthday, she spent time with family as they grieved

18

together.  (R. 1038.)  She was able to avoid a depressive episode and even experienced

enjoyment during their golf trip.  (R. 1038.)  She continued to "face life's obstacles a

little at a time" while interacting with various family members over the course of the

months.  (R. 1042.)

May 2020 continued this trend of improvement.  Plaintiff reported being able to

stop downward thought spirals in half an hour instead of hours.  (R. 1046.)  She did

laundry and took showers more regularly and met up with friends.  (R. 1046-47.)

On June 2, 2020, Plaintiff called Jaeger in crisis, reporting feeling angry and

anxious about her finances, her son's death, increased flashbacks, and frequent intrusive

thoughts.  (R. 1055.)  But by the next week, she had the perfect day filled with a massage,

an eye injection, a haircut, and a chiropractor appointment.  (R. 1059.)  Recent

graduations seemed to trigger traumatic memories of her son.  (R. 1059.)  She canceled

an appointment and only briefly spoke with Jaeger toward the end of the month, where

she reported feeling worried about an upcoming gig in Lake City.  (R. 1061, 1063.)  She

ultimately canceled the gig due to anxiety.  (R. 1066.)  Afterward, she went on a family

vacation, and she felt ready to "clean house" and "let go."  (R. 1066.)

In July, Plaintiff experienced brief relief in reflecting on good memories of her

son.  (R. 1087.)

By August 2020, Plaintiff enjoyed playing in her band and even played a solo

performance.  (R. 1071.)  She reported she was not dwelling as much, but that she still

felt angry and haunted over her last conversation with her late son.  (R. 1071.)  She still

had problems sleeping, intrusive thoughts, and avoided interacting with the public. (R.

1070-73.)  An updated diagnostic assessment still showed severe PTSD, severe anxiety, and severe depression.  (R. 1092-1099.)

In September, Plaintiff had two solo gigs that went well, and she had an easier time getting through the day.  (R. 1074-80.)  Plaintiff was unhappy with her looks, hygiene, and weight.  (R. 1079.)

In October 2020, Plaintiff was again angry at the world and had suicidal ideation without a plan (R. 1082.)  She was stuck in rumination.  (R. 1083.)  Jaeger indicated Plaintiff's mental health symptoms remained moderate to severe, albeit stable.  (R. 1083.) (R. 1082-86.)

On November 3, 2020, Jaeger and the Plaintiff "covered a lot of material today because [Plaintiff] has not been coming in that often."  (R. 1100.)  They reviewed Plaintiff's progress over the last 1½ years.  (R. 1100.)  Plaintiff reported a major depressive episode that did not leave her bedridden that she kept hidden from Jaeger.  (R. 1100.)  She reported drinking more than what she had previously told Jaeger.  (R. 1100.) Plaintiff believed she was in the acceptance stage of grief.  (R. 1101.)  Plaintiff worked out some of the trauma by sharing pictures of her deceased son with Jaeger.  (R. 1101.) Jaeger performed a diagnostic assessment.  Jaeger noted that Plaintiff was more stable, although her mental health was severe.  (R. 1089-90, 1100-02.)  Jaeger did not see Plaintiff reaching a level of functionality to work on a full or part-time basis in the foreseeable future.  (R. 1089-90, 1104-06.)

December 2020 showed episodes of extreme anxiety and panic.  (R. 1229-31, 1233-34.)

20

### C.    Hearing Testimony

The ALJ held a telephonic hearing in December 2020 in which Plaintiff testified. Plaintiff has a GED and a degree in cosmetology, but she has no other vocational training. (R. 40.)  She worked as a bank teller through September 15, 2015.  (R. 41, 43.) While a teller, she was on her feet most of the day, and the most she lifted at any time was fifty pounds. (R. 41.)  Although she also ran a Christian gift shop for a short period, it was not profitable.  (R. 42.)

Plaintiff testified that she left her job because she needed time to process her son's death.  (R. 43-44.)  Too often during her job she would experience a trigger when interacting with coworkers and the public.  (R. 43.)  She took time to go to meetings with survivors of suicide and a Christian grief support group.  (R. 44.)  Her husband received a pension and supported her.  (R. 45.)

Plaintiff has also played guitar and sung in a five-member country band with her husband for the past forty-five years.  (R. 42, 46-47.)  Although she previously suffered with alcohol abuse, she reported she has stayed sober for two years and eight months in support of her son's quest for sobriety, although she recently started drinking socially and with control.  (R. 48-49.)

Plaintiff described her symptoms: sadness, depression, anxiety, and fear of misfortune falling upon someone else that she loves.  (R. 45.)  She felt confused. (R. 46.) Therapy helped her deal with the symptoms.  (R. 46.)  She cycled between doing well and doing poorly.  (R. 50.)  For instance, in April 2018, she experienced a slide and went back on to her medications.  (R. 50.)  At the time she was sad, depressed, and had

21

suicidal thoughts.  (R. 51.)  She woke up sad and angry.  (R. 51.)  She had difficulty

concentrating. (R. 52.)  She was overwhelmed with sadness and anxiety and slept poorly.

(R. 52, 56.)  Feeling overwhelmed made her procrastinate on activities such as painting

her house, preparing for a gig, or going out.  (R. 56.)  She had difficulty finding

motivation to get up, get dressed, and do activities of daily life such as cleaning,

grooming, cooking, and grocery shopping. (R. 53-54.)

The ALJ asked Plaintiff whether she could perform unskilled, repetitive work that

avoid interactions with coworkers and the public.  (R. 47.)  Plaintiff responded "Yeah.

Probably for me the greatest problem would be punctuality and getting myself to get

there. I am still struggling with depression. Yeah."  (R. 47.)  She indicated it was hard to

commit to anything because she struggled with nightmares and a lack of motivation to

clean up and get to any job.  (R. 48.)  Her mind was simply elsewhere.  (R. 48.)

Vocational expert Cyndee Burnett also testified at the hearing.  She stated that a

hypothetical individual of Plaintiff's age, education, work experience, and limitations

could not perform Plaintiff's past work as a bank teller, but could work as a laundry

worker or a mailroom clerk.  (R. 59-60.)  The limitations included: no exertional

limitations; limited to work in a low-stress job defined as having only occasional

decision-making requires; no production rate or pace work, meaning no work at a line or

at a station where the worker cannot control the speed of the work; occasional interaction

with the public; and occasional interaction with coworkers.  (R. 59.)  The vocational

expert testified that the average employer tolerates absenteeism no more than one day per

month and tolerates off-task behavior no more than ten percent of the workday.  (R. 60-

61.)  When Plaintiff's attorney included additional limitations in the hypothetical such as poor or no useful ability to related to coworkers, deal with the public or deal with work stress (R. 61); poor or no useful ability to follow work rules, relate to coworkers, deal with the public, use judgment, interact with supervisors, deal with work stresses, and maintain attention and concentration (R. 61-62); poor or no useful ability to behave in a more sustainable matter or demonstrate reliability at work (R. 62), the vocational expert testified the hypothetical individual would not be able to work.

### D.    The ALJ's Decision

The ALJ issued an adverse decision on December 18, 2020, concluding that Plaintiff was not disabled between September 15, 2015, and June 30, 2018.  (R. 28.)  In arriving at this decision, the ALJ utilized the five-step sequential analysis described in 20 C.F.R. § 404.1520(a)(4).[7]  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since during the period from September 15, 2015, through June 30, 2018.  (R. 18.)  At step two, the ALJ found that Plaintiff had the following severe impairments: major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and alcohol abuse disorder.  (R. 19.)  The ALJ determined that all impairments other than those previously enumerated were either not severe or not medically determinable, including Plaintiff's allegations of back pain, elbow and

---

[7] The five steps are (1) whether the claimant's work activity was substantial gainful activity; (2) the medical severity of the claimant's impairments; (3) whether one or more impairments meets or medically equals the criteria of a listed impairment, and meets the duration requirement; (4) the claimant's RFC and past relevant work; and (5) the claimant's RFC and whether he can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(i)–(v).

shoulder pain, and memory problems.   (R. 19.)

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1 since September 15, 2015.  (R. 19-21.)  The ALJ specifically considered whether Plaintiff's mental  impairments met or equaled the criteria of listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or 12.15 (trauma-and stressor-related disorders).  (R. 19-21.)  In considering the domains of functioning pertinent to mental impairments, he found Plaintiff had a mild limitation in understanding, remembering, or applying information (R. 19); a moderate limitation in interacting with others (R. 20); a moderate limitation in concentrating, persisting or maintaining pace (R. 20); and a moderate limitation in adapting or managing oneself (R. 20).

Between steps three and four, an ALJ must determine the claimant's RFC.[8]  20 C.F.R. § 404.150(e).  Here, the ALJ found that Plaintiff, through the date last insured, had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> The individual would be limited to work in a low stress job defined as having only occasional decision making required, no production rate or pace work, meaning no work at a line or station where the worker cannot control the speed of the work, and capable of only occasional interaction with the public and co-workers.

(R. 21-26.)  In making this finding, the ALJ considered all symptoms and the extent to

---

[8] The RFC assessment is "based on all the relevant medical and other evidence in" the record.  20 C.F.R. § 416.920(e).  A claimant's RFC "is the most [she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).

which those symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence. 20 C.F.R. § 404.1529; S.S.R. 16-3p. The ALJ

followed a two-step process: 1) the ALJ determined whether there is an underlying

medically determinable physical or mental impairment that could reasonably be expected

to produce the claimant's pain or other symptoms; and 2) the ALJ evaluated the intensity,

persistence, and limiting effects of the claimant's symptoms to determine the extent to

which they limit the claimant's work-related activities. (R. 22.)   The ALJ considered the

medical opinions and prior administrative findings in accordance with the requirements

of 20 C.F.R. § 404.1520c.  The ALJ did not defer or give any specific evidentiary weight,

including controlling weight, to any prior administrative medical findings or medical

opinions, including those from medical sources. (R. 25.)  The ALJ explained the weight

given to each opinion and the reasons underlying that weight. (R. 25-26.)

        At step four, the ALJ determined that since September 15, 2018, Plaintiff could

not perform her past relevant work as a bank teller.[9] (R. 26.)  The ALJ thus proceeded to

step five of the sequential evaluation.  The ALJ determined Plaintiff could not perform

the full range of work because nonexertional limitations eroded the occupational base of

unskilled work at all exertional levels.  (R. 27.)  However, based on the vocational

expert's testimony, the ALJ determined Plaintiff could make a successful adjustment to

other widely available jobs such laundry worker or mailroom clerk.  (R. 27.)

---

[9] The term "past relevant work" means "work that you have done within the past 15
years, that was substantial gainful activity, and that lasted long enough for you to learn to
do it."  20 C.F.R. § 416.960(b)(1).

Accordingly, Plaintiff was found not disabled.  (R. 28.)

## II.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to determining whether the decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).  "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law."  *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citing *Dickinson v. Zurko*, 527 U.S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard)).  This standard requires a court to consider not only evidence that supports the ALJ's decision but also evidence that detracts from it.  *See Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  The Court may not, however, reverse the ALJ's decision simply because "the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992).  In other words, "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings," the Court must affirm the decision.  *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).  Put another way, "[t]he agency's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  *Nasrallah v. Barr,* 140 S. Ct. 1683, 1692 (2020) (describing the substantial evidence standard in the context of an immigration case).

26

To be entitled to benefits, the claimant must prove that she was disabled before her insurance expired. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Evidence from outside the insured period can be used in "helping to elucidate a medical condition during the time for which benefits might be awarded," *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998), but "we only consider the applicant's medical condition as of his or her date last insured." *Turpin v. Colvin*, 750 F.3d 989, 993 (8th Cir. 2014).

A court must ensure the ALJ adequately explained his findings and conclusions. The ALJ's determination must indicate which evidence the ALJ relied on and which he rejected, and his reasons for doing so, but he need not cite specific facts supporting specific findings and conclusions. *See Vance v. Berryhill*, 860 F.3d 1114, 1117–18 (8th Cir. 2017) (holding ALJ's findings at step four cured lack of elaboration at step three); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (holding that the ALJ need not discuss every piece of evidence and not citing evidence does not indicate the ALJ did not consider it). But "inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis for remand" if they might change the outcome of the determination; an ALJ, not a reviewing court, must resolve those issues. *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005). *See also Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822–23 (8th Cir. 2008) (reversing when the ALJ's factual findings were insufficient for the court to conclude whether substantial evidence supported the determination); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("[The ALJ's decision] must stand or fall with the reasons set forth in the ALJ's decision."); *David S. v. Saul*, No. 19-CV-3137 (ADM/LIB), 2021 WL 467348, at *3 (D. Minn. Jan. 25, 2021),

*report and recommendation adopted*, 2021 WL 465281 (D. Minn. Feb. 9, 2021) ("A reviewing court cannot search the record to find other grounds to support the decision of the ALJ" when the decision does not provide that support) (cleaned up).

## III.  Discussion

Plaintiff argues the ALJ's determination that she was not disabled prior is not supported by substantial evidence on three grounds.  First, Plaintiff argues the ALJ failed to credit her ongoing disabling symptoms and over-emphasized self-reported improvements in determining her RFC.  (Pl.'s Mem. Supp. Mot. Summ. J. at 25-31 [ECF No. 21].)  Second, Plaintiff argues the ALJ did not properly analyze the medical opinions, particularly those of Lisa Jaeger and Ronald Kahler, in determining Plaintiff's RFC.  (*Id.* at 31-35.)  Third, she argues the ALJ did not pose proper hypotheticals to the vocational expert, which means the ALJ's determination that Plaintiff could perform work is not supported by the record.  (*Id.* at 35-36.)  Furthermore, she contends, the evidence overwhelmingly supports a finding of disability and asks for an immediate award of benefits.  (*Id.* at 36-37.)

### A.  Whether the ALJ's RFC Assessment is Supported by Substantial Evidence

A claimant's RFC represents the most she can do despite the combined effects of all of her limitations, severe and non-severe.  20 C.F.R. § 416.945(a), (e).  The RFC assessment is "based on all the relevant medical and other evidence" in the record.   The claimant bears the burden of establishing her RFC.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir 2004).  The claimant's RFC must be supported by some medical

evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam). That medical evidence should address the claimant's ability to function in the workplace, *see Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003), and "perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007). The RFC must include only those impairments that are substantially supported by the record as a whole. *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001).

### 1.    Plaintiff's Statements Concerning Intensity, Persistence, and Limiting Effects

Plaintiff faults the ALJ's determination that "the claimant's statements concerning the intensity, persistence, and limiting effects of [her alleged symptoms] are not entirely consistent with the medical evidence and other evidence in the record." (R. 23.) Plaintiff makes eight arguments why the ALJ's decision to discount Plaintiff's subjective complaints was not supported by the record. Overall, Plaintiff argues that the "[ALJ] cherrypicks notes to show periods of improvement while omitting ongoing disabling symptoms. The ALJ's focus on minute details tries to distract from the big picture of [Plaintiff's] disability, which is an emotionally crippled woman barely hanging onto living." (Pl.'s Mem. Supp. at 30.)

However, Plaintiff fails to explain how any of the errors impacted the RFC assessment. Plaintiff never argues for a particular limitation to be included in the RFC that could have ruled out competitive work. Instead, Plaintiff has adopted a kitchen-sink approach and effectively asks the Court to reweigh the evidence in her favor. *See Igo v.*

*Colvin*, 839, F.3d 724, 728 (8th Cir. 2016); *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (courts cannot reweigh evidence in Plaintiff's favor).  And she asks the Court to overturn the ALJ's credibility finding of Plaintiff's subjective complaints.  *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("We defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence.").  The ALJ's analysis was consistent with the requirements of Social Security Ruling 16-3p and 20 C.F.R. § 404.1529(c)(3).  The Court will address each argument in turn.

First, Plaintiff argues the fact that she worked after the death of her son is not relevant to her RFC.  (Pl.'s Mem. Supp. at 27.)  She emphasizes that her mental health deteriorated over time, abated only through therapy and medication, until she broke down in September 2015.  But Plaintiff's ability to work immediately prior to her alleged onset date during which she experienced the same or similar symptoms is relevant to the Plaintiff's ability to work after the alleged onset date while suffering from those symptoms.  *Cf. Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994) (upholding denial of benefits where claimant intended to work in the future despite suffering under the same conditions complained of during the relevant period for benefits); (*see also* R. 643 ("[Plaintiff's] symptoms began right after she found out her son died.").  Accordingly, the ALJ did not err in considering Plaintiff's activities predating the alleged onset date.

Second, Plaintiff argues the ALJ relied on the fact that Plaintiff's son did not live with her to support an increased RFC and failed to explain why that fact lessened the sincerity of her claim of disability.  (Pl.'s Mem. Supp. at 27-28.)  But although the ALJ

noted that Plaintiff's son did not live with Plaintiff at the time of his death (*see* R. 20, 21, 23), the observation was only in the context of describing the source of Plaintiff's unresolved grief and anxiety. Nothing in the ALJ's decision suggests that where Plaintiff's son was living at the time of his death played any role in determining the accuracy of Plaintiff's complaints or her RFC.

Third, Plaintiff argues the ALJ "fail[ed] to address record of poor hygiene, infrequency of showering and failing to change clothes" even though the ALJ described incidents of Plaintiff being clean with manicured nails. (Pl.'s Mem. Supp. at 28, citing R. 806, 823-30, 1089-90.) However, the ALJ noted instances of good hygiene (R. 20, 23, 24) and bad hygiene (R. 23 ("she does not clean herself or her home up")) during the insured period. In any event, the records Plaintiff cites in fact support that Plaintiff's "background as a cosmetologist" allows her to "cover up any issues with hygiene" and that "she appears well groomed." (R 806.) "She performs some basic hygiene" even if she only showers once a week. (R. 827, 829.) Therefore, the ALJ had a substantial basis to discount Plaintiff's claim that her hygiene had a substantial limiting effect on her ability to work.

Fourth, Plaintiff argues the ALJ cherrypicked records showing intact cognition and ignored records showing ongoing decreases in cognition. (Pl.'s Mem. Supp. at 28, citing R. 662-67, 775-80, 794-04.) Plaintiff's fifth argument is related: that the ALJ's factual finding that Plaintiff had no significant preoccupations of thought is contrary to records demonstrating significant and persistent preoccupation with the death of Plaintiff's son and the diagnosis of OCD. (Pl.'s Mem. Supp. at 28-29.) The records

31

Plaintiff cites support increases (R. 777) and decreases (R. 665, 796) in cognition.  In assessing cognitive ability during the insured period, the ALJ  noted that Plaintiff had no significant preoccupations, her attention, concentration, and memory were intact, her impulse control was stable, and she denied hallucinations.  (R. 19-20, 23.)  The ALJ acknowledged Plaintiff's invasive and persistent thoughts about her son's death. (R. 20 ("claimant said that she found it difficult to focus due to pervasive thoughts of her son"), 23 (same).)  The record plainly supports some preoccupation with the death of Plaintiff's son.  (*See* R. 637 (ruminations and obsessions about son's death); R. 806 (obsessive thoughts and compulsions especially regarding spirituality and religion); R. 821 (same in January 2020); R. 849 (same in February 2020); R. 913 ("obsesses about getting better" in June 2018); R. 923 ("She reported she is obsessed with her son's death" in April 2018); R. 925 ("obsessive frame of mind"); R. 1137 (obsessive thoughts when about to fall asleep); R. 1154 (ruminations through the day).)  But other records and evaluations—even by the same medical providers—stated "[t]here is no evidence of obsessions or compulsions."  (R. 643; *see also* R. 666 (no diagnosis of OCD); R. 779 (same in July 2019).) The severity of Plaintiff's preoccupations shifted over time.  (*See e,g.*, R. 920 ("reported feeling less obsessive" in May 2018). Plaintiff does not explain any limitation to Plaintiff's RFC that should have been included based on Plaintiff's preoccupations, and even if she did, the ALJ had a substantial basis to conclude the preoccupations were not as significant as Plaintiff claimed. In sum, although the record would support a different decision, the ALJ's decision to discount Plaintiff's subjective complaints about her cognitive abilities—such as concentration, thought process, memory, and impulse

control—during the insured period is equally supported by substantial evidence.

Sixth, Plaintiff faults the ALJ for crediting her participation in a band to substantiate the RFC because Plaintiff's participation was minimal, she relied on her husband and friends for support, and Plaintiff's anxiety actively interfered with performances leading to cancellations, which the ALJ did not address.  (Pl.'s Mem. Supp. at 29, citing R. 742 ("[Plaintiff] may go shopping today, and even though she missed her 'gig' over the weekend the owners of the restaurant still gave her half of the tips."), 897 (discussion of Plaintiff canceling gigs around June 2018 because she was not up to playing), 1021 (cancellation of a gig around March 2020 because it was in Lake City, where she learned of her son's death), 1066 (cancelling a different gig around June 2020 for the same reason).)  Most of the cancellations were caused by a particular trigger of anxiety (Lake City), but that trigger does not impact Plaintiff's ability to work in general.  She also identifies a symptom—lack of motivation—that stopped her from going through with gigs.  Although the ALJ did not address these infrequent cancellations specifically, the decision does address the impact of Plaintiff's lack of motivation and anxiety on her ability to work generally.  It was not error to consider Plaintiff's performance in a band with nearly monthly gigs (R. 262-67), together with the rest of the record, when determining the accuracy of Plaintiff's statements regarding intensity, persistence, and limiting effects.  *See Molitor v. Astrue*, Case No. 11-cv-133, 2012 WL 5183598, at *9-10 (N.D. Iowa Oct. 18, 2012) (finding no error where ALJ discounted social worker opinion because it was inconsistent with claimant's consistent practice and performance in a band); *Martin v. Astrue*, Case No. 08-cv-4704 (DWF/JJK), 2009 WL 2982938, at *18 (D.

Minn. Sept. 14, 2009) (adopting report and recommendation which upheld ALJ's decision to discount certain medical opinions based in part on claimant's hobby of playing music with friends); *Breeze v. Astrue*, Case No. 07-cv-2283 (JMR/RLE), 2008 WL 4181754, at *22-23 (D. Minn. Sept. 8, 2008) (upholding ALJ's decision to discount opinion of a treating physician who claimed total disability as a result of a mental impairment despite claimant's evident functioning as a musician in a bar).

Seventh, Plaintiff takes issue with the ALJ quoting records describing Plaintiff's medical condition as "stable" and "better" because "these words . . . have little indication of the severity of symptoms" because a person who suffers from a mental illness will have better days and worse days. (Pl.'s Mem. Supp. at 29.) In using words like "stable" and "better" the ALJ parroted the words used by Plaintiff's medical providers or even Plaintiff herself. (*See* R. 471 (Plaintiff reports that she "felt stable" in December 2016); R. 606 (Plaintiff "verbalizes stable status" in December 2017); R. 799 ("Her mood was depressed, positive and yet stable" in November 2020); R. 1018 (Plaintiff "seems to be doing slightly better generally, likely in part-due to new medication. Her mood is slightly better, and she is not ruminating and becoming stuck continuously and is worrying less. . . . [She] is making slight progress overtime however continues to be generally unhappy and unfulfilled.") (March 2020); R. 1092-99 (August 2020 evaluation stating Plaintiff's "mental health symptoms have finally became [sic] stable over the last couple months due to combined medication therapy and psychotherapy. [Plaintiff's] symptoms are however still severe.").) These words were not used to conclude that Plaintiff is free from all disabling effects of her trauma, but simply to show that her medical condition

was not getting any worse due to therapy and medication over time.  *See Hensley v. Colvin*, 829 F.3d 926, 937 (8th Cir. 2016) (Kelly, J., dissenting) ("But to describe symptoms as "stable" is simply to state that they are not getting any better or worse; it says nothing about whether the symptoms are disabling.") (citing *Cox v.* Barnhart, 345 F.3d 606, 609 (8th Cir. 2003) and *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001).).  A major theme of Plaintiff's treatment was developing a baseline level of functioning and preventing exacerbations.  Stability suggests the exacerbations were controlled.  Accordingly, there was no error in crediting Plaintiff's stability against Plaintiff's claims of seriously limiting effects of her mental condition.

Eighth, Plaintiff asserts the ALJ credited Plaintiff's reports on good days and ignored Plaintiff's reported complaints on bad days, overly relying on snapshots of her medical records that do not depict her overall condition and ability to work.  *See Wilson v. Astrue*, 493 F.3d 965, 967-68 (8th Cir. 2007) (ordering remand for an award of benefits because ALJ failed to credit treating source's opinion that supported limitations on claimant's ability to interact with the public and co-workers). As is commonly the case with people suffering from mental illness, Plaintiff's symptoms waxed and waned between appointments.  *See Halverson v. Astrue*, 600 F.3d 922, 930 (8th Cir. 2010).   The ALJ analyzed a record spanning six years from 2014 to 2020.  The decision recalls episodes where Plaintiff reported being "significantly gloomy" (R. 23); grieving (R. 23); "despondent" (R. 23); and "depressed and anxious" (R. 23). The ALJ credited as severe Plaintiff's major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and alcohol abuse disorder as severe.  (R. 19.)  It cannot be said that the ALJ

35

only considered Plaintiff's subjective reports of improvement.

The ALJ weighed Plaintiff's subjective complaints about her mental condition together with the objective medical evidence, information from medical sources about symptoms, treatments received, activities of daily living, and inconsistencies within the record. *See* 20 C.F.R. § 404.1529(c); *see also Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Considering the totality of the record, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of her mental conditions were not as severe as claimed. *See Johansen v. Astrue*, Case No. 10-cv-2076 (DWF/SER), 2011 WL 4583831, at *14 (D. Minn. Aug. 15, 2011) ("Where an ALJ seriously considers, but for good reasons explicitly discredits a plaintiff's subjective complaints, the court will not disturb the ALJ's credibility determination.").

To support that determination, the ALJ noted that although the Plaintiff sought therapy, she was also able to work for 13 months after the death of her son. (R. 22.) Although she clearly had unresolved grief, she was neat, clean, and cooperative; her insight was good; and her judgment was good. (R. 22.) In early 2016, Plaintiff "had no significant preoccupations, her attention and concentration were intact, her impulse control was stable, and she denied hallucinations." (R. 23.) Although Plaintiff went off her medications and began drinking heavily, by late 2016 she reported being more positive, decreased her alcohol consumption, and felt supported by her church. (R. 23.) Plaintiff was able to continue performing in her band. (R. 23-24.) Exacerbations of her symptoms were fleeting, caused by temporary stressors like illness in the family or the holidays. (R. 24.) After her date last insured, Plaintiff developed spiritual obsessive

36

rituals to control her anxiety, but it did not rise to a level of an obsessive-compulsive disorder.  (R. 24.)  While she rarely cleaned her house, she did laundry and shopped alone.  (R. 24.)  While depressed, she was positive, stable, and her mood improved with medication.  (R. 24.)  Even during a major depressive episode around the anniversary of her son's death, Plaintiff was not in despair or unable to get out of bed. (R. 24.)

> The ALJ summarized:
>
> The evidence demonstrates that the claimant has grieved the loss of her son. While she has abused alcohol and been noted as both depressed and anxious, the claimant has stabilized with both therapy and medication.  She has continued to perform "gigs," both alone and with a band.  Moreover, she has no significant preoccupations, she can maintain focus, and her attitude is cooperative.  The claimant worked for 13 months after the death of her son, and she has never been hospitalized.  The record in its entirety supports the residual functional capacity above.

(R. 24.)  The ALJ had a substantial basis to discount Plaintiff's claims of severity in light of the Plaintiff's responsiveness to medication and treatment, her daily life activities, her ability to work after the onset of her symptoms, and the overall record as a whole.

## 2.    Medical Opinions & Prior Administrative Medical Findings

Previously, opinions from medical sources with a longstanding treatment relationship could be deemed controlling evidence.  *See Mark E. v. Kijakazi*, Case No. 20-cv-2047 (PAM/JFD), 2021 WL 6066260, at *5 (D. Minn. Dec. 7, 2021).  For claims filed on or after March 27, 2017, however, all medical opinions are evaluated using five factors: supportability; consistency; relationship with the claimant; specialization, and any other relevant factors.  20 C.F.R. § 404.1520c(c).  The two most important factors are supportability and consistency, which the ALJ must address explicitly.  20 C.F.R.

§ 404.1520c(b)(2).  If two medical opinions are equally well supported and consistent with the record and they differ, the ALJ must analyze the other factors (*i.e.* relationship, specialization, and other relevant factors) to determine which opinion is more persuasive. 20 C.F.R. § 404.1520c(b)(3).  When the medical source provides multiple opinions, the ALJ may analyze the findings from that source together in a single analysis and is not required to articulate how he or she considered each finding individually.  20 C.F.R. § 404.1520c(b)(1).

First, Plaintiff argues broadly that the ALJ rejected all medical opinions and impermissibly relied on his own medical opinion to create the RFC.  But ultimately, "[t]he ALJ is responsible for determining a claimant's RFC, a determination that must be based on medical evidence that addresses the claimant's ability to function in the workplace." *Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004).  It is not error for the ALJ to review multiple medical opinions and conclude that the reality lies somewhere in the middle. *See Pierce v. Kijakazi*, 22 F.4th 769, 773 (8th Cir. 2022).  Here, the ALJ determined that the RFC was somewhere between the position of the state agency physicians and Jaeger and Kahler.  Nothing suggests the ALJ impermissibly substituted his own medical opinion in determining Plaintiff's RFC.

Second, Plaintiff asserts the ALJ erred in discounting opinions of Jaeger, Plaintiff's treating therapist after April 2018.  Jaeger indicated that Plaintiff had poor or no ability to make any occupational adjustments, make performance adjustments, or make social adjustments, excepting maintaining personal appearance.  (R. 845-48.)  In effect, Jaeger opined that Plaintiff had severe limitations to every mental faculty.  She

also indicated that Plaintiff would be absent from the workplace due to her medical conditions more than three times a month. (R. 848.)

The ALJ determined that Jaeger's opinion that Plaintiff could not engage in consistently reliable employment was inconsistent with Jaeger's examination findings. (R. 25, citing R. 636-51 (Ex. 7F), 717-93 (Ex. 12F), 832-50 (Ex. 16F), 1100-10 (Ex. 25F), 1115-56 (Ex. 27F).) Using Jaeger's July 2019 updated diagnostic assessment as an exemplar, the ALJ gave several reasons for discounting Jaeger's opinions. (R. 25-26, citing R. 662-67 (Ex. 9F).) First, Jaeger found Plaintiff had difficulties in all areas of mental functioning, even though Plaintiff reduced treatment to as-needed, continued to perform as a singer, had improved cognition and judgment, and Jaeger repeatedly documented appropriate thought content in her clinical observations and observed Plaintiff's judgment was only slightly impaired. (R. 25.) Second, Jaeger diagnosed obsessive-compulsive disorder and found Plaintiff was severely impaired thereby, but Jaeger did not document symptoms supporting that diagnosis. Moreover, Plaintiff was never hospitalized and never attempted suicide, and Jaeger repeatedly documented Plaintiff's self-reported stability. (R. 26.)

Plaintiff argues these reasons do not form a substantial basis to discount Jaeger's opinions. (Pl.'s Mem. Supp. at 33.) First, Plaintiff points out that although in the July 2019 record cited by the ALJ, Jaeger states that Plaintiff attended therapy "as needed," the record as a whole shows that Plaintiff "needed" therapy on a weekly basis both before and after July 2019. (*See* R. 1087 (cataloging 2020 appointment dates).) Second, although Jaeger knew of Plaintiff's participation in the band, she also knew of Plaintiff's

39

anxiety-induced cancellations and performance difficulties and those formed a part of the basis for her opinions. (Pl.'s Mem. Supp. at 33.) Third, while Plaintiff showed significant improvement in the single record cited by the ALJ, the rest of Jaeger's opinions and observations reveal fluctuations and exacerbations of Plaintiff's symptoms. (*Id.*) Fourth, and finally, although Jaeger stated Plaintiff was stable, the records show that she meant less volatile or not getting worse as opposed to "not severe." (*Id.*)

The Commissioner does not defend the ALJ's articulated reasons and instead points to other bases for upholding the determination. The Commissioner points out that the ALJ is not required to consider Jaeger's opinion on Plaintiff's ultimate ability to work at all, as that is an issue reserved to the Commissioner, making Jaeger's opinion neither valuable nor persuasive evidence. 20 C.F.R. § 404.1520b(c). The Commissioner argues Jaeger's retrospective assessments are too remote in time from the date last insured to be persuasive, and that Jaeger's status as a new (i.e., less experienced) counselor as opposed to a seasoned nurse, psychologist, or psychologist makes her opinion unpersuasive. (Comm'r's Mem. Supp. Mot. Summ. J. at 18-19 [ECF No. 31].) The Commissioner also argues the opinion is not supportable because it "relied more upon Plaintiff's subjective complaints and [Plaintiff's] need for financial assistance than on [Jaeger's] own scant examination findings and modest treatment recommendations." (*Id.* at 19.) And finally, the Commissioner argues Jaeger's opinions are inconsistent with 1) Plaintiff's hiatus from treatment in 2017; 2) the opinions of treatment providers such as Riester and Gumulauskas; and 3) Plaintiff's activities of daily life such as riding a motorcycle, spending time with friends and family, group meetings, reading books, practicing her

music, and performing music for pay.  (*Id.* at 19-20.)

But the ALJ's decision "must stand or fall with the reasons set forth in the ALJ's

decision." *Newton*, 209 F.3d at 455.  Granted, the ALJs work under heavy burdens and

need not give detailed explanations for why they accepted or rejected certain evidence.

*Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985).  But while it is appropriate for

the Commissioner to elaborate on an ALJ's cursory reasoning in defense of the decision,

it would undermine the appellate nature of the proceedings in the district court to uphold

the disability determination on a basis not relied upon by the ALJ.

That being said, the ALJ's decision to discount Jaeger's opinions is well-supported

by substantial evidence.  First, the record belies Plaintiff's argument that she continued

seeking treatment at the same rate from 2015 to 2020.  The records are replete with

treatment gaps, slowdowns, and also intense periods of therapy around certain triggering

times such as the holidays and anniversaries of major events.  Second, Jaeger's opinions

are inconsistent with her own notes and the record as a whole.  Her determination that

Plaintiff was totally debilitated by her mental impairments from April 2018 to December

2020 is inconsistent with 1) Plaintiff's participation in the band solo and as a group; 2)

her reported stability suggesting Plaintiff's fluctuations were at times controlled; 3)

Jaeger's own notes that recognize significant improvement, little cognitive impairment,

and significant periods of moderate symptoms, *Milam v. Colvin*, 794 F.3d 978, 983 (8th

Cir. 2015); 4) Plaintiff's lack of hospitalization; and 5) Plaintiff's inconsistent need for

therapy.  The ALJ used the July 2019 record to highlight the immutability of Jaeger's

opinion regarding Plaintiff's ability to work and residual functioning despite evidence of

improvement and functioning.[10]  Substantial evidence relied upon by the ALJ supports

the decision to discount Jaeger's opinions.

Third, Plaintiff argues the ALJ erred in discounting the opinion of Kahler, a

licensed psychologist who provided an opinion for the sole purpose of supporting

Plaintiff's social security claim.   Kahler's RFC assessment echoed the significant

limitations found by Jaeger.  The ALJ rejected his opinion because it was inconsistent

with 1) records evidencing adequate attention and concentration in 2019; 2) Plaintiff's

participation in the band and her solo performances; 3) Plaintiff's denial of mania and

delusions; 4) the lack of records showing thought process issues; 5) the Plaintiff's

reported improvements at the time of the examination in 2019; 6) the lack of

psychological in-patient admissions or suicide attempts; 7) the fact Plaintiff was

cooperative, fully-oriented, and had a full range of affect; 8) Jaeger's reports of Plaintiff's

stability; and 9) records showing intact memory.  (R. 26.)

Plaintiff argues the ALJ should have addressed Kahler's testing results and the

consistency of Kahler's opinion with Jaeger's opinion.  (Pl.'s Mem. Supp. at 33-34.)  The

Commissioner's response does not address either argument but instead relies on many of

the same arguments used in connection with Jaeger's opinions.  (Comm'r's Mem. Supp.

at 21-22.)  The Commissioner argues the December 2019 assessment should not be

viewed in conjunction with the November 2019 report but as a conclusory check-the-box

---

[10] The Court recognizes that in assessing inconsistency in cases concerning mental health
impairments, ALJs and courts alike should be careful not to conflate a medical provider's
opinion's inconsistency with documentation of the claimant's fluctuations and volatility.
The ALJ in this case has not done this.

form with little persuasive value. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir.

2012).  And the Commissioner argues that Kahler did not treat Plaintiff and only saw her

once, sixteen months after Plaintiff's date last insured; such a weak relationship to the

claimant, according to the Commissioner, undermines the opinion's persuasive value.

*See* 20 C.F.R. § 404.1520c(c)(3) (relationship with claimant).[11]

Again, the Court concludes it would not be appropriate to uphold the decision of

the ALJ for reasons the ALJ himself did not give.  In particular, where the ALJ only

addresses supportability and consistency under 20 C.F.R. § 404.1520c(c), the other

factors such as the medical providers' specialization and relationship to the claimant are

not grounds for upholding the decision.  Although another ALJ might have decided to

credit Kahler's opinion to the extent it was supported by objective testing and consistent

with Jaeger's opinion, the ALJ adequately supported his conclusion that Kahler's opinion

was inconsistent with the record as a whole and therefore had a sufficient basis to find the

opinion not persuasive.  *See Halverson*, 600 F.3d at 930.  The decision to discount the

opinion fell within the zone of available choice.  *See Travis v. Astrue*, 477 F.3d 1037,

1042 (8th Cir. 2007).

### B.    Whether the ALJ Erred in Asking Defective Hypothetical Questions to the Vocational Expert

In order for an ALJ to rely on the testimony of a vocational expert responding to

---

[11] The Commissioner also argues Kahler's status as a counselor as opposed to a nurse, psychologist, doctor, or psychiatrist suggests his opinion should be given little weight. *See* 20 C.F.R. § 404.1520c(c)(4) (specialization factor).  (Comm'r's Mem. Supp. at 22.) This argument is based on an erroneous premise.  Kahler is a licensed psychologist.  (R. 800.)

hypothetical questions, the ALJ must propound a hypothetical which precisely states the nature of the claimant's condition and limitations. *See Ludden v. Bowen*, 888 F.2d 1246, 1249 (8th Cir. 1989). Testimony of a vocational expert who responds to a hypothetical based on inaccurate limitations is not substantial evidence upon which to base a denial of benefits. *Singh v. Apfel*, 217 F.3d 586 (8th Cir. 2000).

Plaintiff contends that "the ALJ's hypothetical questions were not supported by the record, and did not accurately reflect [Plaintiff's] mental health condition. When the limitations were added into the hypothetical, the [vocational expert] testified that [Plaintiff] would be unable to perform her past work or any work." (Pl.'s Mem. Supp. at 35-36.) During the hearing, Plaintiff's counsel inquired in the effects of limitations related to interpersonal interactions in the office, interactions with the public, coping with stress, following work rules, using judgment, interacting with supervisors, maintaining attention or concentration, reliability, and absenteeism. (R. 61-62.)

Plaintiff's briefing does not explain how the ALJ erred in omitting any of the limitations raised by Plaintiff's representative during the hearing or how the record demands their inclusion. The limitations referenced during the hearing all derive from the mental RFC assessments conducted by Jaeger and Kahler. (*See* R. 61-62.). As the Court concluded, the ALJ had a substantial basis for rejecting these assessments. Furthermore, the ALJ included limitations based on the severe impairments he did find, including only occasional decision making, no rate or pace work, and only occasional interaction with the public and co-workers. (R. 21.) In so doing, he rejected as

44

unpersuasive the opinions of the state agency consultants who found Plaintiff's

impairments to be no more than mild in all areas of mental functioning.  (R. 25.)

The hypothetical posed by the ALJ to the vocational expert represented an

accurate assessment of Plaintiff's RFC, and therefore substantial evidence supported the

ALJ ultimate finding of no disability based on Plaintiff's ability to perform work

available in the national economy.

### C.    Whether an Immediate Award of Benefits is Appropriate

Because the Court concludes that remand is not required, the Court necessarily

concludes that reversal with direction for immediate award of benefits is inappropriate.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment [ECF No. 20] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [ECF No. 30] be **GRANTED**;
      and

3.    **JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: June 20, 2022

_/s Hildy Bowbeer_____
HILDY BOWBEER
United States Magistrate Judge


### NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is
therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local

Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).